**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RYAN MURPHY, | ) |
| | ) |
|        Petitioner, | ) |
| | ) |
| v. | ) |
| | )   Case No. 11-cv-7194 |
| RICK HARRINGTON, Warden, | ) |
|     Menard Correctional Center,[1] | ) |
| | ) |
|       Defendants. | )   Judge Sharon Johnson Coleman |
| | ) |

## MEMORANDUM OPINION AND ORDER

*Pro se* petitioner Ryan Murphy is an inmate in the custody of the Illinois Department of

Corrections. He is serving a sixty-year sentence for a conviction on first degree murder including a

firearm sentence enhancement for the death of Curtis Thomas. Murphy has petitioned the Court

under 28 U.S.C. § 2254 for a writ of habeas corpus, arguing that his conviction was the result of

violations of his Fourteenth Amendment right to due process and his Sixth Amendment right to

effective assistance of counsel. For the reasons stated herein, the petition is denied.

## BACKGROUND

### I.  Trial Court Proceedings

Petitioner has not directed the Court to clear and convincing evidence that the state court's

factual determinations were incorrect. Therefore, the Court adopts them for purposes of reviewing

his habeas petition. *See* 28 U.S.C. § 2254(e)(1); *Wooley v. Rednour*, 702 F.3d 411, 426-27 (7th Cir.

2012). The state court's factual determinations were set out in *People v. Murphy,* No. 1-06-1978 (Ill.

---

[1] Rick Harrington, the current warden of the Menard Correctional Center, is substituted as the respondent. *See* Rule 2(a) of the Rules Governing Section 2254 Cases; Fed. R. Civ. P. 25(d); *Rumsfeld v. Padilla,* 542 U.S. 426, 436 (2004).

App. Ct. Sept. 3, 2008) (Dkt. 15-2, Respondent's Ex. D), and the relevant facts are summarized here with much of the trial testimony included.

*Testimony of Joseph Dean*

On the evening of May 27, 2000, decedent Curtis Thomas was hanging out in front of a restaurant at 5637 West Division Street in Chicago, Illinois, with Joseph Dean, his brothers Richard Dean and Thomas Dean, Joseph's cousin Michael Boyce, Quendalyne Alexander, Nakenya Hardy, and Darnell Hayes. Joseph testified that he and Curtis Thomas grew up together and he considered Curtis to be his big brother. He also testified that he and Curtis were members of the Four Corner Hustlers gang, and that Curtis had been a member of the gang's "Body Snatcher" section but was retired at the time. Joseph testified that Quendalyne was Curtis' girlfriend at the time. The group frequently loitered in front of the restaurant at Parkside Avenue and Division Street, including every day in 2000.

On the night in question, the group was talking and drinking next to Joseph's car. Quendalyne was sitting in the back seat of the car on the passenger side with her feet hanging out. Joseph was sitting on the trunk. At about 11 p.m., Joseph heard a gunshot and began running down Division Street. He continued running after hearing several more gunshots. The gunfire stopped and Joseph was about a half of a block away when he saw petitioner Ryan Murphy shoot Curtis who was already on the ground. Joseph then saw petitioner walk around the corner and down Parkside Avenue. Joseph ran back to his car and drove to Quendalyne's mother's house. According to his testimony, Joseph did not approach Curtis because he thought Curtis was dead. When he returned to the scene a short time later, Joseph did not talk to the police because he "wanted to stay out of it."

Joseph testified that he had known petitioner Ryan Murphy from the neighborhood for about 13 years and that he saw him hanging out in the neighborhood five or six times a week before

the shooting. He also testified that petitioner hung out at the corner of Parkside Avenue and Division and had been shot at that corner in February 2000. Joseph testified that petitioner was affiliated with the Cicero Insanes gang, but that gang and the Four Corner Hustlers were at peace at the time of the shooting. Joseph moved out of the neighborhood after his brother Thomas was killed on March 10, 2001, and he did not see petitioner in the neighborhood between Curtis' death and when he moved.

Joseph testified that he had two convictions for possession of a controlled substance and unlawful use of a weapon by a felon, and he was on probation at the time of his testimony. Joseph acknowledged that he had contact with police officers after Curtis was shot, but that he did not talk about the shooting until August 2003. Joseph was at the police station on March 13, 2001, and was arrested on September 7, 2002, but at neither time did he tell the police about Curtis' shooting.

*Testimony of Goldie Enochs*

Goldie Enochs testified that he had known both Curtis and petitioner since 1994, but that he was better friends with Curtis. Goldie testified that he and Curtis were both members of the Four Corner Hustlers gang. Goldie had lived near the corner of Parkside and Division since 1992, except for a brief period when he was incarcerated. Between December 1999 and May 2000, Goldie saw petitioner near the corner of Parkside and Division four or five times a week.

The day before Curtis was killed, Goldie spoke to petitioner in front of petitioner's home. Goldie told him to "leave it alone," to which petitioner responded, "you don't shoot nobody and don't kill them." Goldie testified that petitioner was referring to Curtis, who had previously shot petitioner. On the evening that Curtis was shot, Goldie testified that he was in a parked car with his girlfriend and a friend named "Sean," smoking a "blunt" when petitioner approached the car. Petitioner leaned against the car and Goldie saw the handle of a gun inside petitioner's jacket pocket. Goldie and petitioner talked about Curtis having shot petitioner, and discussed petitioner getting

back at Curtis. Petitioner asked Goldie if he wanted to "take care of some business." Goldie declined to help him. Goldie told petitioner that it was not worth it because defendant had a life ahead of him. Goldie testified that petitioner then walked away from him through a vacant lot to an alley leading to Parkside Avenue. Goldie ordered his girlfriend and friend out of the car so he could go warn Curtis. As Goldie approached the corner of Parkside and Division he saw petitioner shoot Curtis in the face. Curtis fell to the ground and petitioner shot him again. Goldie then drove home.

Goldie explained that petitioner confided in him because he did not know how close of a friendship Goldie had with Curtis. Goldie denied that he shot dice with petitioner a few days before the shooting, and Goldie did not recall telling a grand jury that he had done so. Goldie admitted that at the time of his testimony he was in custody in DuPage County for failing to appear in court. Goldie admitted that he had several felony convictions: in 1992 for two burglaries with a sentence of two consecutive five-year prison terms; in 1997 for unlawful possession of a weapon by a felon with a sentence of two years in prison; in 1998 for unlawful possession of a weapon by a felon with a sentence of three years in prison. Goldie was arrested in June 2000 for possessing narcotics and cannabis. Only after he was arrested and out on bond in August 2000, Goldie told the police and the assistant state's attorney that petitioner had shot Curtis. Goldie was subsequently convicted and sentenced to two concurrent four-year prison terms for possession of a controlled substance and possession of cannabis. A detective and the prosecutor visited him in prison to discuss the shooting.

In 2002 Goldie was convicted of possession of a controlled substance with intent to deliver for which he received probation. He violated his probation in August 2002 when he was found to be in possession of a weapon. Goldie received 120 days in jail before being put back on probation. Goldie again violated his probation in 2004 and pleaded guilty to another felony for which he received two years' probation. Again in 2004, Goldie was arrested for drug possession and remained in custody at the time of his testimony. He admitted that every time he was arrested, he used a

different name, date of birth, and social security number. Goldie also testified that his testimony was not made in exchange for any promises with respect to his most recent arrest.

*Testimony of Quendalyne Alexander*

Quendalyne Alexander testified that on May 27, 2000, she was with her ex-boyfriend Curtis, Lakesha Hardy, Michael Boyce, and Donnell Hayes. Joseph, Thomas, and Richard Dean, were also present at the corner of Parkside and Division. The group was standing by Joseph's car talking and drinking beer. Quendalyne was sitting in the back passenger seat with her feet out on the curb. At about 11 p.m. Quendalyne saw petitioner walk around the corner from Parkside toward Curtis and the group. She testified that she knew petitioner from the neighborhood and was aware that Curtis had previously shot him. Quendalyne was afraid when petitioner approached the group. She testified that petitioner pointed a gun at Curtis and shot him. Quendalyne fell to the floor of the car and the rest of the group ran away. She heard several shots fired as she crawled through the vehicle to exit the other side. After the shooting stopped, Quendalyne ran across the street to a cab stand and asked a dispatcher to call an ambulance. Quendalyne saw petitioner get into his car and drive away. She also saw Curtis' body lying on the ground and believed he was dead.

Quendalyne testified that Joseph returned to his vehicle with Quendalyne's mother and they took her home. Quendalyne further testified that the police neither contacted her nor asked her any questions. She testified that she never contacted the police because she was scared. Quendalyne testified that she did not see petitioner in the neighborhood until one or two years later. She did not talk to anyone in law enforcement until August 2003 when she was subpoenaed to come to court.

*Testimony of Other Prosecution Witnesses*

Richard Amberger, a forensic scientist with the Illinois State Police specializing in firearms identification. Amberger examined five fired bullets and one fired bullet fragment associated with this case. He determined that all five fired bullets were .38 or .357 caliber, which is usually associated

with a revolver. In his opinion, all five bullets and the fired bullet fragment were discharged from the same gun.

Dr. Edmund Donoghue testified that he was employed as the Chief Medical Examiner for Cook County and conducted the autopsy of Curtis Thomas on May 27, 2000. Dr. Donoghue found evidence of six gunshot wounds: one to the left rear of Curtis' head, two to his left shoulder, one to his left upper chest, one to his left upper back, and one on the back of Curtis' right hand. Dr. Donoghue found no evidence of close-range firing.

Detective Michael Landando testified that, on September 11, 2001, he and police officers from the McHenry County Sheriff's Office arrested defendant in Island Lake, Illinois. Detective Landando testified that at the time, he was assigned to a fugitive apprehension unit. He explained that the unit attempts to locate and arrest offenders identified in connection with homicides. He testified that on August 13, 2000, he received a stop order identifying petitioner as an offender in connection with this case. Detective Landando learned that defendant worked for a roofing contractor. Detective Landando admitted that petitioner had been working under his own name rather than an alias. On cross-examination Landando testified that he identified himself as an unemployment agent when he contacted petitioner to place him under arrest.

*Defendant's Case-in-Chief*

Officer Anthony Johnson testified that on May 27, 2000, he was assigned to talk to any witnesses at the crime scene where Curtis was shot. Officer Johnson testified that no one came forward to tell him what happened and he did not discover any witnesses at the scene. Officer Johnson testified that he was aware on that date that the corner of Division and Parkside was a "drug spot" where illegal narcotics were sold by gang members.

Assistant State's Attorney ("ASA") Barbara Dawkins testified that, on August 25, 2003, she took a written statement from Quendalyne Alexander. ASA Dawkins testified that she questioned

6

Quendalyne about what happened when Curtis was shot and wrote down anything relevant that Quendalyne stated with respect to the shooting. Dawkins did not remember whether Quendalyne told her that after the shooting she ran to a cab stand and spoke to a dispatcher. Dawkins admitted that she did not include this information in the handwritten statement because it occurred after the shooting and was not relevant.

The parties then stipulated that, on October 1, 2001, Goldie testified before the grand jury that he shot dice with petitioner a few days before the shooting. The parties also stipulated that, on August 3, 2000, the police interviewed Goldie at the station and the written report from that interview did not indicate that Goldie stated that his friend "Sean" was in the car on the day of the shooting. Lastly, the parties stipulated that petitioner was arrested on September 11, 2001, and that petitioner was 5'4" tall and weighed 140 pounds.

The jury returned a verdict of guilty of first degree murder and found that the fact existed that during the commission of the offense, petitioner personally discharged a firearm that proximately cause the death of Curtis Thomas.

*Motion for a New Trial*

Petitioner hired private counsel and filed a motion for a new trial, alleging ineffective assistance of trial counsel and perjury by Goldie Enochs. At the hearing on the motion, Candace Williams testified that she was Goldie's girlfriend in May 2000, and he is the father of her child. On the evening of May 27, 2000, Candace and Goldie were sitting in her parked car talking, Sean Smith was not with them in the car, and petitioner did not come up to the car to talk to Goldie. She testified that she and Goldie went inside her home and then heard gunshots. In August 2000, she received a phone call from Goldie, who was at the police station. Goldie instructed Candace to tell the police that on the night of Curtis' shooting, petitioner walked up to them while they were seated in the vehicle and asked Goldie to "take care of business" with him. Candace refused because she

did not want to lie for him. When the police contacted Candace and asked her if petitioner spoke to Goldie while she and Goldie were in the parked car, she told them "no". Candace admitted that she and Goldie were no longer in a relationship when he called her from the police station. She also admitted that she and petitioner grew up together and were friends. Candace testified that, while she knew Curtis had been shot, she did not know that petitioner had been arrested for murdering him until petitioner's retained counsel contacted her in 2005.

Petitioner's aunt, Diane Lynn testified that her sister and petitioner's mother, Grace Murphy, told Diane that petitioner had been shot. Grace asked Diane if petitioner could live with Diane and her husband at their home in McHenry County, Illinois. Diane testified that she agreed and that petitioner moved in to her home in late March 2000. She further testified that he had no access to a car and lived at their home seven days a week. She testified that petitioner did not spend a night away from their home between March and December 2000. Diane admitted that she could not say with certainty that petitioner was in her presence on the evening of May 27, 2000. Diane also testified that, although she was subpoenaed to testify at the trial, defense counsel did not call her as a witness.

Grace Murphy, petitioner's mother testified that she lives near the corner of Parkside Avenue and Division Street in Chicago. She also testified that shortly after he son was shot in February 2000, he husband called her at work because a group of people came to the house and were yelling obscenities at petitioner. Grace asked her sister Diane if petitioner could live with her in McHenry County. Grace drove petitioner out to his aunt's house in McHenry County where he lived for about a year. Grace also testified that petitioner did not have a car, that she drove him to his probation officer in Chicago several times, and that she drove petitioner's girlfriend out to McHenry County to visit him. Petitioner never stayed with his mother overnight or for extended periods,

while he was living in McHenry County. After the hearing the court denied the motion for a new trial.

*Sentencing*

At the sentencing hearing, the prosecution read a victim impact statement from Curtis' mother and described petitioner's criminal history. In March 1995, petitioner was adjudicated delinquent for robbery and aggravated battery. He failed to complete probation. In 1998 he was found guilty of possession of cannabis and completed two years of probation. In March 2002, petitioner was fined for a battery offense. In mitigation, defense counsel argued that petitioner was 19 years old at the time of the shooting, that he had been employed at the time of his arrest, and that he was the father of two small children. The court sentenced him to 35 years for first degree murder and an additional 25 years for the firearms enhancement for a total of 60 years in prison.

## II. Direct Appeal

Appellate counsel presented three issues to the Illinois Appellate Court: (1) whether the cumulative effect of trial counsel's errors deprived Ryan Murphy of the effective assistance of counsel; (2) whether the trial court abused its discretion when it denied Ryan Murphy's motion for a new trial; and (3) whether the trial court abused its discretion when it sentenced Ryan Murphy to 60 years imprisonment. Specifically, he argued that trial counsel was ineffective for failing to call witnesses, failing to conduct a reasonable investigation, admitting hearsay evidence, failing to move to exclude evidence, and failing to object to the prosecutor's rebuttal argument. The cumulative effect of trial counsel's errors deprived petitioner of effective assistance of counsel and therefore the trial court abused its discretion by denying him a new trial. Appellate counsel argued that the court should reduce petitioner's sentence because it is excessive in light of his age at the time of the offense and his rehabilitative potential.

The court affirmed the conviction, holding that the failure to call as witnesses Diane Lynn and Grace Murphy was trial strategy; the decision not to interview Candace Williams did not constitute ineffective assistance where petitioner could not point to any favorable testimony that trial counsel could have investigated prior to trial; trial counsel's comments about Michael Boyce during opening statements were a reasonable part of counsel's strategy to discredit the State's witnesses; the court also rejected petitioner's arguments, that counsel's cross-examination of Goldie Enochs was deficient, that he failed to file a motion in limine to bar Detective Landando from testifying that he was assigned to the fugitive apprehension unit and elicited testimony about Landando's tactics, and failing to object during the prosecution's rebuttal closing. Because the appellate court held that petitioner was not denied effective assistance of trial counsel, it declined to address petitioner's argument that the trial court abused its discretion by denying his motion for a new trial on that basis. Finally, the appellate court found that the circuit court had not abused its discretion by imposing a sentence in the middle of the statutory range for first degree murder and the minimum for the firearm enhancement. Further, the court held that there was no evidence to support petitioner's argument that the trial court did not consider his mitigation evidence.

*PLA*

Petitioner filed a petition for leave to appeal ("PLA") to the Illinois Supreme Court in which he raised the same ineffective assistance of trial counsel arguments as he did on appeal. The Illinois Supreme Court denied his PLA.

### III. Collateral Proceedings

Petitioner filed a *pro se* post-conviction petition under the Illinois Post-Conviction Hearing Act, 725 Ill. Comp. Stat. 5/122-1, *et seq.*, asserting ten claims.

Claim One:     Petitioner was denied a fair trial and due process of law when the State prosecutor knowingly and intentionally suppressed *Brady* documents "material" to the defense.

Claim Two:    Petitioner was denied a fair trial and due process of law when the State suborned perjury by Goldie Enochs.

Claim Three:  Petitioner was denied a fair trial and due process of law when the State failed to establish its motive theory, and therefore argued highly prejudicial facts before the jury.

Claim Four:   Petitioner was denied his right to a fair trial where, during jury selection, three jurors expressed doubt about their ability to be impartial, stated that they or someone close to them was associated with law enforcement, and also stated that they or someone close to them had been the victim of a crime.

Claim Five:   The trial court erred in allowing the State to make inflammatory and prejudicial arguments before the jury.

Claim Six:    The State committed prosecutorial misconduct in closing arguments by inflaming the passions and prejudices of the jury to arouse their sympathy and by perpetuating fraud by falsifying evidence.

Claim Seven:  The trial court erred in denying the State and defense use of peremptory challenges.

Claim Eight:  Ineffective assistance of trial counsel.

Claim Nine:   Ineffective assistance of post-trial counsel.

Claim Ten:    Ineffective assistance of appellate counsel.

The state circuit court denied each of Murphy's claims. (Respondent's Ex. H). It found that claims one through seven could have been raised on direct appeal and thus those claims were waived. *Id.* at 11; *People v. Coleman,* 168 Ill. 2d 509, 522 (1995). The issue with Candace Williams was *res judicata* because it was raised and addressed on direct appeal. *Id.* The circuit court also rejected Murphy's ineffective assistance of counsel claims. The court found Murphy's ineffective assistance of trial counsel claims lacked merit and further found that Murphy's ineffective assistance of

appellate and post-conviction counsel were frivolous and without merit where the underlying claims were nonmeritorious.

Murphy appealed the denial of his post-conviction petition. The assigned appellate defender asserted one issue: whether the circuit court's assessment of $105 in costs and fees pursuant to 735 Ill. Comp. Stat. 5/22-105 violated Ryan Murphy's right to due process and equal protection under the law. Murphy filed a pro se motion for leave to file a supplemental brief and argument. (Respondent's Ex. J). In his proposed supplemental brief, Murphy raised two issues: (1) whether he was denied a fair trial and due process of law when the state prosecutor suppressed *Brady* documents "material" to the defense and due to the suppression of these documents the state misled defense counsel about exculpatory witnesses and allowed the state to suborn perjury; (2) whether he was denied a fair trial and due process of law when the prosecutor, through the guise of motive evidence failed to establish defendant's knowledge of the facts upon which the state premised its motive theory. The Illinois Appellate Court denied Murphy leave to file the supplemental brief. (Respondent's Ex. L). The appellate court affirmed the circuit court's assessment of $105 in costs and fees pursuant to 735 Ill. Comp. Stat. 5/22-105. *People v. Murphy,* No. 1-10-0053 (April 13, 2011). (Respondent's Ex. O). Murphy filed a *pro se* PLA in the Illinois Supreme Court raising three issues: (1) ineffective assistance of appellate counsel for failing to raise meritorious claims on direct appeal; (2) the appellate court erred by denying Murphy's motion to file a supplemental brief; and (3) the appellate court erred by denying Murphy's motion to file a supplemental brief without first holding a hearing. The Illinois Supreme Court denied Murphy's PLA.

**IV. §2254 Petition**

Murphy then filed the instant *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254. In it, he raises four claims.

Claim One: The appellate court violated Murphy's Fourteenth Amendment procedural due process

right when the State suppressed *Brady* material in the form of Candace Williams'

statement, generated a false document in the form of a police "stop order," and

suborned perjury by Goldie Enochs.

Claim Two: Ineffective assistance of trial counsel from the following errors: (a) failing to call Diane

Lynn and Grace Murphy as alibi witnesses; (b) failing to call Candace Williams as a

witness; (c) injecting Michael Boyce's hearsay identification of petitioner into the trial

during his opening statement and during cross-examination of Joseph Dean, given that

the State did not call Boyce as a witness; (d) eliciting testimony that Murphy sold illegal

drugs around age eleven during cross-examination of Goldie Enochs; (e) failing to file a

motion *in limine* seeking to bar the arresting officer (Landando) from testifying about the

fugitive apprehension unit; and (f) failing to object to the State's closing rebuttal

argument that police officers were "thorough" in their investigation.

Claim Three: The trial court abused its discretion in denying his motion for a new trial in light of the

errors committed by trial counsel enumerated in Claim Two; and

Claim Four: Petitioner's sixty-year sentence was excessive in light of his age and rehabilitative

potential.

## DISCUSSION

## I.     Standard of Review

Murphy filed his petition for writ of habeas corpus *pro se*, and the court will therefore

construe the petition liberally. *See Gomez v. Randle*, 680 F.3d 859, 864-65 (7th Cir. 2012). To be

entitled to a writ of habeas corpus, Murphy's petition must establish that the state court decision he

challenges is either "contrary to" or "an unreasonable application of" clearly established federal law

as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor,* 529

U.S. 362, 404-05 (2000). In *Williams*, the Supreme Court explained that a state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by the Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite ours." *See Williams*, 529 U.S. at 405.

To satisfy the "unreasonable application" prong under § 2254(d)(1), a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *See id.* at 407. A state court's application of United States Supreme Court precedent is unreasonable if the court's decision was "objectively" unreasonable. *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) ("even a strong case for relief does not meant that the state court's contrary conclusion was unreasonable").

## II.    Murphy's Claims

Claims One, Three, and Four of Murphy's petition are procedurally defaulted. In order to receive federal habeas relief, a state prisoner must have properly presented his claims in the state court. *Johnson v. Pollard*, 559 F. 3d 746, 751-52 (7th Cir. 2009). A federal court will not review a question of federal law decided by a state court if the state court decision rested on a state procedural ground independent of the federal question and adequate to support the judgment. *See Martinez v. Ryan*, 132 S. Ct. 1309, 1316 (2012); *Moore v. Bryant*, 295 F.3d 771, 774 (7th Cir. 2002). The doctrine applies to claims "a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez*, 132 S. Ct. at 1314; *see also Moore*, 295 F.3d at 774.

A state habeas petitioner's claim may also be procedurally defaulted if petitioner fails to raise an issue for "one complete round" of state court review. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In Illinois, one complete round of review includes two tiers of appellate review; appeal to the Illinois Appellate Court and, at minimum, a petition for leave to appeal to the Illinois Supreme

Court. *Id.* "One complete round" may be either direct appeal or postconviction proceedings. *White v. Godinez*, 192 F. 3d 607, 608 (7th Cir. 1999). This court may still review claims that are procedurally defaulted if petitioner demonstrates cause and prejudice or a miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).

*Claim One*

Murphy's first claim has three parts: that the appellate court erred when it denied him a fair opportunity to present his claim that the State suppressed *Brady* material in the form of Candace Williams' statement, generated false document in the form of a police "stop order," and suborned perjury by Goldie Enochs. Murphy's first opportunity to raise this claim was in postconviction proceedings because it is a claim against the Illinois Appellate Court. However, his claim is procedurally defaulted because it was not raised in a complete round of postconviction proceedings. Although Murphy raised these issues in his *pro se* postconviction petition, they were not raised on appeal and only by reference in his PLA to his proposed supplemental *pro se* appellate brief for which he was denied leave to file. Murphy attempted to raise this issue on appeal from the denial of his postconviction petition, by requesting leave to file a supplemental brief. It appears that the appellate court found the request untimely since it was not filed until after his appellate counsel's reply brief.

The appellate court issued its denial of the request only three days after Murphy filed his motion without explanation. While this Court cannot know for certain the reason for the denial because the Illinois Appellate Court did not provide one, Illinois Supreme Court Rule 362(e) sets the time limit for amending pleadings in the reviewing court. Indeed, the rule mandates that "no application for amendment of pleadings or process will be considered if made after the cause has been submitted for decision." Therefore, this Court concludes that since Murphy did not seek to amend or

supplement his appeal until after the matter had been fully briefed, the appellate court denied leave based on the procedural rules. *See Woods v. Schwartz,* 589 F.3d 368, 375-76 (7th Cir. 2009).

Moreover, the last court to address the merits of this claim, the state circuit court ruling on the postconviction petition, found on independent and adequate state grounds that this claim was not supported in the record. Murphy's allegations about Enochs' perjury were conclusory and not based on any factual or documentary support and the post-trial testimony from Candace Williams that Murphy did not ask Enochs to help him shoot Curtis Thomas did not exist at the time of trial. The trial record showed that the "stop order" was generated by statements from Candace Williams to police that she heard Murphy say he was going to kill Curtis Thomas moments before she witnessed him doing so.

Murphy has not provided cause or prejudice from the failure to raise his claim nor can he show a "fundamental miscarriage of justice." Murphy does not assert that any external factor prevented him from raising this issue. *See Harris v. McAdory*, 334 F.3d 665, 668 (7th Cir. 2003). Goldie Enochs' testimony that he witnessed Murphy shoot Curtis Thomas was not the only eye-witness testimony identifying Murphy. Even if Enochs had been impeached with Candace Williams' later testimony that Enochs' asked her to lie for him, there was other testimony and evidence to support the jury's verdict. Thus, Murphy cannot show that he was prejudiced nor is there anything to support a claim for actual innocence. *See Ouska v. Cahill-Masching,* 246 F.3d 1036, 1050 (7th Cir. 2001); *Schlup v. Delo*, 513 U.S. 298, 321 (1995). Claim One is therefore procedurally defaulted with no excuse compelling this Court to consider the claim.

*Claim Three*

Claim Three asserting that the trial court abused its discretion when it denied Murphy's motion for a new trial in light of the multiple alleged errors committed by trial counsel is also procedurally defaulted. Murphy did not raise this issue in on complete round of state court review.

While Murphy did raise the issue on direct appeal, he failed to include it in his PLA. Murphy did not assert the issue in his postconviction proceedings. Therefore, this claim is procedurally defaulted. Murphy provides no excuse warranting review by this Court.

*Claim Four*

Claim Four arguing that his sentence is excessive is defaulted for the same reasons as Claim Three. Claim Four is procedurally defaulted for the additional reason that Murphy did not fairly present the federal constitutional basis for Claim Four. Section 2254 mandates exhaustion of claims, meaning that a habeas petitioner "fairly present" the federal constitutional basis of the issue to the state judiciary. *Baldwin v. Reese,* 541 U.S. 27, 124 S. Ct. 1347, 158 L. Ed. 2d 64 (2004); *Lockheart v. Hulick*, 443 F.3d 927, 929 (7th Cir. 2006). Fair presentment requires the state court pleadings to argue or cite to cases that would alert the court to the federal nature of the claim. *Baldwin*, 541 U.S. at 33. There are four factors the court applies to assess whether a habeas petitioner fairly presented the claim in state court: "1) whether the petitioner relied on federal cases that engage in a constitutional analysis; 2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation." *White v. Gaetz,* 588 F.3d 1135, 1139 (7th Cir. 2009).

All four factors weigh against finding that Murphy fairly presented the issue as a federal constitutional claim. On direct appeal, Murphy argued that the court should reduce his sixty year sentence because it is excessive in light of his young age at the time of the offense and his rehabilitative potential. (Respondent's Ex. A, at 42). Murphy's appellate counsel argued that that trial court failed to consider his age as a mitigating factor and for his rehabilitative potential. There are no citations to federal cases or to the U.S. Constitution. His argument contains only state statutes, cases,

and the Illinois Constitution. The argument with respect to the Illinois Constitution is on the specific mandate that, in Illinois, penalties must be determined according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. The argument does not present a federal claim and there is nothing within it to alert the appellate court to a federal basis for the claim. The entire argument has ample basis in state law without resorting to an Eighth Amendment argument that would have no greater chance of success. Murphy's sentence of 35 years for first degree murder is in the middle of the 20 to 60 year statutory range (730 ILCS 5/5-8-1(a)(1)(a)), and the 25 year weapon enhancement is the statutory minimum (703 ILCS 5/5-8-1(a)(1)(d)(iii)). Accordingly, this Court finds that Murphy failed to fairly present Claim Four in the state court as a federal constitutional claim.

*Claim Two*

Claim Two is the sole claim that Murphy raised for one complete round of state court review and was adequately presented as a federal claim. He asserts ineffective assistance of trial counsel on six bases: (a) failure to call Diane Lynn and Grace Murphy as alibi witnesses, (b) failure to call Candace Williams as a witness, (c) injection of Michael Boyce's hearsay identification of petitioner into the trial during his opening statement and during cross-examination of Joseph Dean when ultimately the State never called Boyce as a witness, (d) elicitation of the fact that petitioner sold illegal drugs around age eleven during cross-examination of Goldie Enochs, (e) failure to seek to bar the arresting officer (Landando) from testifying that he was assigned to the fugitive apprehension unit, and (f) failure to object to the State's rebuttal argument that the police officers were "thorough" in their investigation. None of these claims meets the *Strickland* test for ineffective assistance of counsel.

The Sixth Amendment guarantees all criminal defendants the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Under *Strickland*, a petitioner must

demonstrate both that (1) his counsel provided deficient assistance and (2) that there was prejudice as a result. *Id.* at 690, 694. When a state court has ruled on the merits of a habeas claim, our review is circumscribed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See* 28 U.S.C. § 2254(d); *Harrington v. Richter*,    U.S.   , 131 S.Ct. 770, 783-84, 178 L.Ed.2d 624 (2011). Under AEDPA, this Court may grant relief only if the state court's decision on the merits "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2). The Seventh Circuit Court of Appeals has recognized that federal courts should deny a habeas corpus petition so long as the state court took the constitutional standard "seriously and produce[d] an answer within the range of defensible positions." *Atkins v. Zenk*, 667 F.3d 939, 943-944 (7th Cir. 2012) (quoting *Mendiola v. Schomig*, 224 F.3d 589, 591-92 (7th Cir. 2000)). Here, the Illinois Appellate Court has applied the federal constitutional standard set forth in *Strickland* consistently and reasonably.

The state court found that the failure to call Diane Lynn and Grace Murphy as alibi witnesses did not run afoul of the Sixth Amendment. The decision whether to call particular witnesses is a matter of trial strategy and will not ordinarily support an ineffective-assistance-of-counsel claim. *People v. Marshall*, 381 Ill. App. 3d 724, 733 (1st Dist. 2008); *United States v. Curtis*, 742 F.2d 1070, 1074 (7th Cir. Ill. 1984). Here, neither Ms. Lynn nor Ms. Murphy could unequivocally testify to petitioner's whereabouts on the evening in question. Therefore, counsel may have concluded that the value of their testimony was limited and would not overcome the evidence against Murphy, or that their testimony would not stand up to scrutiny under cross-examination, potentially causing more harm than good. *See, e.g., United States ex rel. Foreman v. Hardy*, No. 11 C 0469, 2011 U.S. Dist. LEXIS 76087 (N.D. Ill. July 14, 2011) (St. Eve, J.) (concluding on habeas

review that the state court reasonably found it was not ineffective assistance of counsel to fail to call two alibi witnesses when other witnesses placed the petitioner at the scene of the murder).

Next, petitioner argues that trial counsel was ineffective for failing to call Candace Williams as a witness to rebut the testimony of Goldie Enochs. In the state court, petitioner argued that counsel was ineffective for failing to interview Candace Williams prior to trial. However, an attorney only has an obligation to investigate all readily available sources of evidence that might benefit the client. *People v. Irvine*, 379 Ill. 2d 116, 130 (2008). Candace Williams was a prosecution witness and therefore the court found no fault in counsel's performance.

The record shows that prior to trial, defense counsel had the police "stop order" indicating that Candace Williams would provide testimony corroborating Goldie Enochs' version of events. A police report dated August 2000 documented Goldie Enochs' statement to police and provided Candace Williams as a corroborating witness. Accordingly, the Illinois Appellate Court reasonably found that counsel was not ineffective for failing to interview Candace Williams where the record clearly indicated that she would be helpful only to the prosecution. For the same reason, trial counsel is not deficient for failing to call her as a witness at trial. Her testimony changed after petitioner's trial. Petitioner has not provided any pre-trial statement by Candace Williams favorable to the defense that counsel could have investigated in order to call her as a defense witness. Therefore, counsel was not ineffective on this issue.

Next, petitioner argues that trial counsel was ineffective for injecting Michael Boyce's hearsay identification of petitioner into the trial during his opening statement and during cross-examination of Joseph Dean when ultimately the State never called Boyce as a witness. The state court concluded that defense counsel's strategy from the outset of the trial was to undermine the credibility of the State's witnesses. Therefore, the appellate court found that counsel's injection of Boyce into the case did not constitute ineffective assistance because Michael Boyce was listed as a

prosecution witness and counsel's argument with respect to Boyce's identification of petitioner was consistent with that trial strategy. During opening, counsel was merely stating what he believed the State's evidence would show and attempting to discredit the State's proposed witnesses. Similarly, defense counsel's reference to Boyce's identification of petitioner in his cross-examination of Joseph Dean was clearly an effort to undermine Dean's credibility. Dean was only the third State witness to testify, therefore, counsel would not have known that the State would not call Boyce as a witness. "Minimizing the 'sting' of an opponent's impeachment by initiating the impeachment yourself is a time-honored trial tactic, however, one practiced by the prosecutor and defendant alike." *United States v. Ewings,* 936 F.2d 903, 909 (7th Cir. 1991). It was reasonable and consistent with defense counsel's strategy to undermine the credibility of prosecution witnesses and this Court will not second-guess that tactic now. Furthermore, the references were so fleeting as to have minimal impact on the trial's outcome. At most, the jury might wonder why the State did not call Boyce and the logical inference to be drawn therefrom is that his testimony would not assist the prosecution. Defense counsel's performance therefore was not deficient on this score.

Next, petitioner argues that trial counsel was ineffective for eliciting testimony during cross-examination of Goldie Enochs that petitioner sold illegal drugs around age eleven. Counsel elicited the testimony at issue during cross-examination of Goldie Enochs about his multiple felony convictions and that he knew petitioner from the neighborhood. Enochs' was the State's key witness. The effort by counsel to diminish Enochs' credibility by confronting him about his extensive criminal history was sound trial strategy. The impact of the fact that petitioner and Enochs sold drugs together when they were very young was likely very slight and there is nothing to indicate that without that fact, the outcome would have been different. This Court agrees with the Illinois Appellate Court that the counsel's conduct on this issue does not meet the *Strickland* threshold.

Next, petitioner argues that trial counsel's performance was ineffective for failing to move to bar the arresting officer (Landando) from testifying that he was assigned to the fugitive apprehension unit. This issue is without merit. Detective Landando testified that he was assigned to a fugitive apprehension unit and explained the purpose of the unit. He also testified that he received a "stop order" to arrest Murphy in connection with the case for which he was on trial. The testimony was background information explaining how Detective Landando came to arrest petitioner. The explanation provided context without which the jury would be left to speculate how the police found and arrested Murphy more than a year after the incident. Defense counsel's choice to allow the testimony was sound strategy weighing the potential damage of that factual truth of how Murphy was arrested against the potential for speculation by the jury.

Lastly, petitioner argues that defense counsel's performance was deficient for failing to object to the State's rebuttal argument that the police officers were "thorough" in their investigation. The state court found the remarks were well within the bounds of proper closing argument based on the evidence and the reasonable inferences to be drawn therefrom. This Court agrees. The trial record indicates that Curtis Thomas was shot on May 27, 2000, and petitioner was arrested on September 11, 2001, despite the fact that police had a statement from Goldie Enochs implicating petitioner, they waited and gathered corroborating evidence. In Illinois, prosecutors have considerable leeway in closing arguments and may properly comment on issues, facts, and remarks by prosecution in rebuttal argument are not improper if provoked or invited by defense counsel's argument inferences invited by the defense. *People v. Starnes*, 374 Ill. App. 3d 132, 138 (1st Dist. 2007).

Here, defense counsel commented in closing on the fact that the State did not call any detectives to testify about how they conducted the investigation and called into question the investigation methods that led to petitioner. Accordingly, it was reasonable for the prosecution to

comment on that issue in rebuttal. Defense counsel may have believed that an objection that would have been sustained would draw unnecessary attention to the point. When examined in the context of the entire argument, such comments rarely constitute reversible error if based only on the evidence from trial and reasonable inferences drawn therefrom. *Id.* Both the prosecution's argument and defense counsel's decision not to object were within the bounds of appropriate trial practice.

This Court finds that the Illinois Appellate Court's decision with respect to petitioner's ineffective assistance of trial counsel was reasonable and not contrary to the law. Even if this Court were to find that one of counsel's alleged errors rose to the level of ineffective assistance, petitioner has not shown, and cannot show, prejudice based on any of the alleged errors. The trial record demonstrates that more than one witness identified petitioner as the shooter. There was testimony that Curtis Thomas had shot petitioner the previous year and petitioner was not able to produce any alibi witness that could testify as to his whereabouts on the night in question. Therefore, this Court concludes that petitioner has not met the *Strickland* standard to demonstrate ineffective assistance of trial counsel.

The Court declines to issue a certificate of appealability. Petitioner has not made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). For the reasons stated herein, this Court denies Ryan Murphy's habeas corpus petition.

IT IS SO ORDERED.

Date: April 21, 2014                                  Enter